UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER P., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, <br> Acting Commissioner of Social Security, <br><br> Defendant.[1] | Case No.: 20-cv-01893-JLB <br><br> **ORDER RE: PLAINTIFF'S MERIT'S BRIEF** <br><br> **(ECF No. 13)** |

On September 23, 2020, plaintiff Alexander P. ("Plaintiff") filed a Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. (ECF No. 1.)

Now pending before the Court and ready for decision is Plaintiff's merits brief. (ECF No. 13.) The Commissioner filed an opposition (ECF No. 18), and Plaintiff filed a reply (ECF No. 19). For the reasons set forth herein, the Court affirms the decision of the Commissioner and **DENIES** Plaintiff's request for reversal and remand.

---

[1]   Kilolo Kijakazi the Commissioner of Social Security is hereby substituted as defendant for Andrew Saul. *See* Fed. R. Civ. P. 25(d).

1

I.  **PROCEDURAL BACKGROUND**

On April 28, 2017, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, alleging disability beginning April 1, 2015. (Certified Administrative Record ("AR") at 371–74.) After his application was denied initially and upon reconsideration (AR 213–17, 220–25), Plaintiff requested an administrative hearing before an administrative law judge ("ALJ") on October 16, 2017 (AR 226–27). An administrative hearing was held on August 23, 2018. (AR 41–87.) Plaintiff appeared at the hearing with counsel, and testimony was taken from him, as well as from a vocational expert ("VE") and medical expert. (AR at 41–87.) On October 24, 2018, the ALJ determined that Plaintiff was not disabled from April 1, 2015, through the date of decision. (AR 166–90.)

Plaintiff requested reconsideration of the ALJ's decision. (AR 284–86.) On May 3, 2019, the Appeals Council remanded the case to an ALJ. (AR 191–94.) A second administrative hearing was held on February 27, 2020, before a different ALJ, Kevin Messer. (AR 88–127.) Plaintiff appeared at the hearing with counsel, and testimony was taken from him, as well as from a VE. (AR at 88–126.)

As reflected in his April 1, 2020, hearing decision, ALJ Messer found that Plaintiff had not been under a disability, as defined in the Social Security Act, from April 1, 2015, through the date of decision. (AR 16–40.) The ALJ's decision became the final decision of the Commissioner on July 27, 2020, when the Appeals Council denied Plaintiff's request for review. (AR 1–6.) This timely civil action followed.

II. **SUMMARY OF THE ALJ'S FINDINGS**

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520. At step one, the ALJ found that Plaintiff had been engaged in substantial gainful activity since December 2018. (AR 22.) However, there was a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity. (AR 22.) The ALJ's remaining findings only address the period Plaintiff did not engage in substantial gainful activity. (AR 22.)

At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, lumbar radiculopathy, right knee lateral meniscus tear with osteoarthritis, diabetes mellitus type 2 with peripheral neuropathy, subacromial impingement syndrome of the right shoulder status post arthroscopy with subacromial depression, interstitial cystitis, anxiety, major depressive disorder, and agoraphobia with panic disorder.  (AR 22.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (AR 22.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") "to perform sedentary work," as defined in 20 C.F.R. § 404.1567(a), with the following limitations:

> [T]he claimant is limited to occasional climbing of ramps and stairs, but can never climb ladders, ropes, or scaffolds.  He can occasionally balance, stoop, kneel, crouch, and crawl.  The claimant can never overhead reach bilaterally, but frequently reach in all other directions.  The claimant must avoid concentrated exposure to hazards such as operational control of moving machinery and unprotected heights.  The claimant is limited to understanding, remembering, and carrying out simple, routine tasks, only occasional interaction with the general public, only occasional work-related, non-personal, non-social interaction with coworkers and supervisors, and can perform jobs requiring only simple work-related decisions.

(AR 24.)

For purposes of his step four determination, the ALJ determined that Plaintiff was unable to perform any past relevant work.  (AR 30.)

The ALJ then proceeded to step five of the sequential evaluation process.  Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of occupations that existed in significant numbers in the national economy (*i.e.*, inspector, electrical assembler, sealer), the ALJ found that Plaintiff was not disabled under the law from April 1, 2015, through the date of decision,

April 1, 2020. (AR 31–32.)

## III. PLAINTIFF'S CLAIMS OF ERROR

As reflected in Plaintiff's merit brief, the disputed issues that Plaintiff is raising as grounds for reversal and remand are as follows:

1. Whether the ALJ failed to resolve the apparent conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT") requirements for the occupations identified;

2. Whether the ALJ failed to offer any reason for rejecting the reviewing doctor's opinion limiting Plaintiff to understanding, carrying out, and remembering one- to- two- step instructions; and

3. Whether the final decision of the Commissioner, finding Plaintiff not disabled, was prejudiced by an unconstitutional delegation of authority.

(ECF No. 13 at 4.)

## IV. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence means "more than a mere scintilla" but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 575-76 (9th Cir. 1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. This Court must review the record as a whole and consider adverse as well as supporting evidence. *Green v. Heckler*, 803 F.2d 528, 529–30 (9th Cir. 1986). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984). In reaching his findings, the ALJ is entitled to draw inferences which logically flow from the evidence. *Id.*

///

## V. DISCUSSION

### A. The ALJ's Consideration of the VE's Testimony

At step five of the sequential evaluation process, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (AR 31.) The ALJ based his determination on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of representative occupations such as inspector (with 13,000 jobs nationally), electrical assembler (with 14,400 jobs nationally), and sealer (with 15,000 jobs nationally). (AR 31.) The ALJ determined that the VE's testimony was consistent with the information contained in the DOT. (AR 31.) Based on this finding, the ALJ concluded that a finding of "not disabled" was appropriate. (AR 31.)

Plaintiff argues that there are apparent and unresolved conflicts between the electrical assembler and inspector occupations and the DOT, leaving only the sealer position. (ECF No. 13 at 6.) Plaintiff further argues that if the electrical assembler and inspector occupations are excluded, the ALJ did not find that the 15,000 sealer jobs nationally represented a significant number of jobs and case law does not support such a conclusion. (*Id.*) The Court addresses these arguments below.

#### 1. Legal Standard

At step five, the Commissioner has the burden of establishing "there are a significant number of jobs in the national economy that claimant can do." *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). "There are two ways for the Commissioner to meet the burden of showing that there is other work in 'significant numbers' in the national economy that claimant can do: (1) by the testimony of a [VE], or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2," known as the "Grids." *Id.*; *see also Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002). "The Grids are used to determine whether substantial gainful work exists for the claimant with respect to substantially uniform levels of impairment." *Thomas*, 278 F.3d at 960. When the Grids

"do not adequately take into account claimant's abilities and limitations, the Grids are to be used only as a framework, and a [VE] must be consulted." *Id.*

"Hypothetical questions posed to the [VE] must set out *all* the limitations and restrictions of the particular claimant," which are supported by the record. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). A VE's testimony has no evidentiary value if the hypothetical does not reflect all impairments supported by the record. *Id.*; *see also Thomas*, 278 F.3d at 956.

Occupational evidence provided by a VE "generally should be consistent with the occupational information supplied by the DOT." Social Security Ruling ("SSR") 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000).[2] However, when a VE provides evidence about the requirements of an occupation, the ALJ "has an affirmative responsibility to ask about any possible conflict" between the VE evidence and information provided in the DOT. *Id.* at *4; *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) (holding that an ALJ may not rely on a VE's testimony regarding the requirements of a particular job without first inquiring whether the testimony conflicts with the DOT).

When there is an apparent unresolved conflict between the VE evidence and the DOT, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE evidence to support a determination or decision about whether the claimant is disabled. SSR 00–4P, 2000 WL 1898704, at *2–4; *see also Massachi*, 486 F.3d at 1153. "[T]he conflict must be 'obvious or apparent' to trigger the ALJ's obligation to inquire further." *Lamear v. Berryhill*, 865 F.3d 1201, 1205 (9th Cir. 2017) (citing *Gutierrez v. Colvin*, 844 F.3d 804, 808 (9th Cir. 2016)).

---

[2]   SSRs "do not carry the force of law, but they are binding on ALJs nonetheless. They reflect the official interpretation of the [Social Security Administration ("SSA")] and are entitled to some deference as long as they are consistent with the Social Security Act and regulations." *Molina v. Astrue*, 674 F.3d 1104, 1113 n.5 (9th Cir. 2012) (superseded by regulation on other grounds) (quotations and citations omitted).

Neither the DOT nor the VE evidence automatically "trumps" when there is a conflict; rather, the ALJ must resolve the conflict by determining if the explanation given by the VE is reasonable and provides a basis for relying on the VE testimony rather than the DOT information.  SSR 00–4P, 2000 WL 1898704, at *2–4; *see also Massachi*, 486 F.3d at 1153.  The ALJ must "explain the resolution of the conflict irrespective of how the conflict was identified." *Id.* at *4.

    2.    <u>Analysis</u>

During Plaintiff's hearing, at the outset of the VE's testimony, the ALJ asked the VE to let him know if her testimony was "inconsistent with the DOT or [Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ('SCO')]."  (AR 112.)  The VE agreed to do so.  (AR 112.)  The ALJ then asked the VE whether there would be any unskilled jobs in the national economy for the following hypothetical person: an individual "who can do work at the sedentary exertional level" and would be "limited to occasional climbing ramps and stairs, never climbing ladders, ropes, scaffolds, occasional balancing, stooping, kneeling, crouching and crawling;" "limited to no overhead reaching bilaterally and only frequent reaching all other directions"; "must avoid concentrated exposure to hazards, operation and control of moving machinery and unprotected heights"; limited to "understanding, remembering and carrying out only simple, routine tasks, occasional interaction with the general public, occasional work related, non-personal, non-social interaction with coworkers and supervisors and can perform jobs requiring only a simple work-related decision."  (AR 114.)  The VE responded that the occupations of inspector, electrical assembler, and sealer would be available.  (AR 114.)

Based on the foregoing, the ALJ met his burden of providing a complete hypothetical to the VE, which included all of the restrictions and limitations found in Plaintiff's RFC.  (*See* AR 114.)  The ALJ also asked the VE whether there was a possible conflict between the VE's evidence and the information provided in the DOT.  (AR 112.)  The VE did not state that there was any inconsistency between her testimony and the DOT or SCO.

However, Plaintiff argues that there were obvious or apparent conflicts between the VE's testimony and the DOT with respect to the electrical assembler and inspector occupations, and the ALJ's failure to resolve these conflicts constitutes reversible error. (ECF No. 13 at 6.) The Court will address Plaintiff's arguments with respect to each occupation below.

### a. *Electrical Assembler/Stem Mounter*

The first representative occupation identified by the VE was an electrical assembler, also known as a stem mounter. *See Gutierrez*, 844 F.3d at 807 (noting the DOT refers to occupations, which may include numerous jobs, and lists the maximum requirements of each occupation as generally performed). The DOT defines a stem mounter as someone in the lighting fixtures industry who "[f]astens tungsten wire (filament) to glass stem to form mount for electric light bulb," "[l]oops wire over hooks on glass stem held in revolving table and clinches hooks in place, using pliers," and "[c]ements ends to lead wires, using brush and carbon cement." Stem Mounter, DICOT 725.684-018, 1991 WL 679557 (Jan. 1, 2016).

Plaintiff argues that the "DOT reports that stem mounters require constant reaching" and Plaintiff is limited to "never reaching overhead bilaterally and frequently in all other directions." (ECF No. 13 at 6.) Plaintiff contends that this was an apparent unresolved conflict that the VE did not self-identify. (*Id.*) Plaintiff further argues that "[i]n light of the VE failing to self-identify the apparent conflict when she confirmed to the ALJ that she would, the trustworthiness of the VE's overall testimony is undermined." (*Id.* at 7.) Plaintiff concludes that the ALJ erred by finding the VE's testimony consistent with the information contained in the DOT. (*Id.*)

According to the DOT, a stem mounter reaches constantly or 2/3 or more of the time. DICOT 725.684-018, 1991 WL 679557. Reaching involves "extending the hands and arms in any direction." SSR 85-15, 1985 WL 56857, at *7 (Jan. 1, 1985). "Constantly" is defined as an activity or condition that exists "2/3 or more of the time," while "frequently" is defined as an activity or condition that exists "1/3 to 2/3 of the time." *See* DOT App. C, 1991 WL 688702 (Jan. 1, 2016).

Resolving the question of whether the ALJ erred with respect to overhead reaching requires the Court "to determine whether *overhead* reaching is such a common and obvious part" of being a stem mounter that the ALJ should have recognized a conflict and questioned the VE more closely before determining that Plaintiff could perform this occupation. *See Gutierrez*, 844 F.3d at 807. In *Gutierrez*, the Ninth Circuit found that the ALJ did not err in a similar situation "because there was no apparent or obvious conflict between the [VE's] testimony that [the claimant] could perform as a cashier, despite her weight bearing and overhead reaching limitations with her right arm, and the [DOT's] general statement that cashiering requires frequent reaching." *Id.* at 808. Although reaching "connotes the ability to extend one's hands and arms in any direction," the Ninth Circuit stated that "not every job that involves reaching requires the ability to reach overhead" and "[c]ashiering is a good example." *Id.* (internal quotation marks omitted). Here, the Court is not convinced that a sedentary assembler who works on a revolving table and assembles electrical items (as opposed to installing them) is an occupation that the ALJ should have recognized as one that requires the ability to reach overhead. However, the ALJ should have recognized and resolved the apparent conflict between Plaintiff's limitation to only frequent reaching and the DOT requirement that an assembler be able to reach constantly, and he failed to do so. Accordingly, the Court finds that the ALJ erred in this respect.

The Commissioner concedes that there appears to be a conflict but asserts that any error was harmless because the ALJ properly found that Plaintiff could perform the sealer and inspector occupations. (ECF No. 18 at 11.) The Court will therefore turn to address these occupations.

        b.  *Inspector/Dowel Inspector*

The next representative occupation identified by the VE was an inspector, also known as a dowel inspector. DICOT 669.687-014, 1991 WL 686074 (Jan. 1, 2016). The DOT defines a dowel inspector as someone in the woodworking industry who "[i]nspects dowel pins for flaws, such as square ends, knots, or splits, and discards defective dowels."

*Id.* The occupation requires the ability to make judgments and decisions, which includes "solving problems, making evaluations, or reaching conclusions based on subjective or objective criteria." (AR 682.)

Plaintiff argues that there is an apparent conflict between Plaintiff's limitation to only simple work-related decisions and the occupation of dowel inspector because the occupation requires the temperament to make judgments and decisions. (ECF No. 13 at 7–9.) Plaintiff contends that the VE did not self-identify the apparent conflict, so the conflict remains unidentified and unresolved. (*Id.* at 9.) Plaintiff argues that the ALJ erred by finding the VE's testimony consistent with the information contained in the DOT. (*Id.*) For the reasons set forth below, the Court disagrees.

The DOT states that the reasoning level for a dowel inspector is Level 1,[3] which is defined as the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and to "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." DICOT 669.687-014, 1991 WL 686074. The occupation is also identified as specific vocational preparation ("SVP") Level 2, which indicates preparation involving "[a]nything beyond short demonstration up to and including 1 month." *Id.* A job that a person can usually learn to do in thirty days is unskilled work that "needs little or no judgment to do simple duties." 20 C.F.R. § 404.1568(a); *see also* SSR 00-4P, 2000 WL 1898704, at *3 (Dec. 4, 2000) ("unskilled work corresponds to an SVP of 1–2"). In addition, the ability to "us[e] reason and judgment to make work-related decisions" falls under the paragraph B criteria relating to understanding, remembering, or applying information. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §

---

[3]   "There are six [General Educational Development] Reasoning Levels that range from Level One (simplest) to Level Six (most complex)." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1002 (9th Cir. 2015) (citing DOT, App. C, 1991 WL 688702 (Jan. 1, 2016)).

12.00(E)(1).  In this regard, the ALJ found that Plaintiff was only moderately limited.  (AR 23.)

Plaintiff argues that the "the record does not disclose how making judgments or decisions about which dowels are defective is a simple decision when that decision is based on criteria involving some of the five senses, knowledge, and past experience about how many square ends, knots, or splits renders a dowel defective."  (ECF No. 13 at 9.)  Plaintiff further argues that "[w]hile determining whether a dowel is defective or not might be a simple decision for most dowels that pass by the inspector, deciding the suitability of dowels that are on the borderline of acceptable or defective requires judgement and careful consideration which elevates those work decisions above simple."  (*Id.*)  In response, the Commissioner states that although Plaintiff "speculates as to possible ways that inspecting a dowel could be complicated, . . . he fails to cite any authority supporting his contentions."  (ECF No. 18 at 11.)  The Commissioner argues that Plaintiff's "lay opinion about the vocational requirements of an occupation is invalid and does not take precedence over the [VE's] testimony that the inspector occupation involved only simple tasks, would not require more than simple judgments, and was consistent with an RFC for making simple work-related decisions."  (*Id.*)

The Court agrees with the Commissioner.  Although the dowel inspector occupation requires Plaintiff to use some judgment, all indicators suggest the occupation requires little to no judgment in the execution of simple duties.  The definition in the DOT supports this position.  A dowel inspector is looking for "flaws, such as square ends, knots, or splits."  *See* 1991 WL 686074.  This does not obviously require abilities of careful consideration beyond Plaintiff's RFC.  Rather, it appears consistent with Plaintiff's RFC limitation to

1  "simple work-related decisions." (AR 24.)[4]  Accordingly, the Court finds there was no
2  apparent unresolved conflict between the VE evidence and the DOT for the ALJ to resolve.

        c.    *Sealer/Ampoule Sealer*

The last representative occupation identified by the VE was a sealer, also known as an ampoule sealer. DICOT 559.687-014, 1991 WL 683782 (Jan. 1, 2016). The DOT defines a sealer as someone in the woodworking industry who "[s]eals ampoules filled with liquid drug products, preparatory to packaging"; "[r]otates neck of ampoule in flame of bunsen burner to melt glass"; "[g]rips tip of ampoule, using tweezers, and draws tip away from neck to seal ampoule as glass hardens"; and "places sealed ampoule in basket for sterilization and inspection." *Id.* A sealer may also "hold unsealed ampoule against jet of inert gas to displace air, . . . immerse sealed ampoules in dye bath to test for leaks, [and] . . . tend machines that steam-wash and fill ampoules." *Id.* The occupation involves sedentary work, Reasoning Level 2, and is an SVP Level 2. *Id.* The occupation also involves frequent reaching and handling. *Id.*

Plaintiff concedes that the "DOT/SCO description of an ampoule sealer ostensibly fits within the parameters set forth in [Plaintiff's RFC]." (ECF No. 13 at 10.) However, Plaintiff argues that the "elimination of the other two jobs identified materially impacts this claim" by reducing the aggregate number of jobs. (*Id.*) Plaintiff argues that the 15,000 sealer jobs, standing alone, does not represent a significant number. (*Id.*)

As set forth above, the Court finds that the ALJ properly identified the sealer and inspector occupations as other work that Plaintiff could perform. The VE testified that there are 13,000 inspector jobs nationally and 15,000 sealer jobs nationally, for a total of 28,000 jobs nationally. (AR 31, 114.) An ALJ may properly rely on a VE's "testimony regarding the number of relevant jobs in the national economy," as an "ALJ may take

---

[4]    Plaintiff's counsel also took the opportunity to question the VE about her testimony during the hearing. (AR 116–17.) The VE testified that Plaintiff making a "simple mistake would not be an issue" for the jobs she identified. (AR 116.)

administrative notice of any reliable job information, including information provided by a VE." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). The Court finds that 28,000 jobs nationally constitute a significant number. *See Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (finding 25,000 jobs nationally to be a significant number of jobs); *see also Garner v. Saul*, 805 F. App'x 455, 459 (9th Cir. 2020) (finding 30,000 jobs of one occupation nationally to meet the statutory standard).

For the foregoing reasons, the Court finds that the ALJ did not err at Step Five in determining that jobs existed in significant numbers in the national economy that Plaintiff could perform considering his age, education, work experience, and RFC. (*See* AR 31.)

**B.   Opinion of Randall J. Garland, Ph.D.**

Next, Plaintiff argues that the ALJ erred by failing to properly assess the opinion of state agency psychological consultant Randall J. Garland, Ph.D. (ECF No. 13 at 11–15.) On initial review of Plaintiff's application, Dr. Garland provided a mental RFC for Plaintiff. (AR 139–42.) As relevant here, Dr. Garland opined that Plaintiff was not significantly limited in his ability to understand, remember, and carry out very short and simple instructions, but he was moderately limited in his ability to understand, remember, and carry out detailed instructions. (AR 140.)

Dr. Garland subsequently elaborated in a "notes" section as follows:

> Cl should be able to meet the following criteria on a sustained basis in a competitive, remunerative work context where there is relatively low interpersonal contact (e.g., low contact with the public; working alone or with limited contact with supervisor or co-workers): *To understand, carry out, and remember simple instructions* (e.g., understanding and learning terms, instructions, and procedures; maintaining attention/concentration for approximately 2 hour blocks; understanding, carrying out, & remembering 1 to 2 step instructions; recognizing a mistake and correcting it; being able to work consistently and at a reasonable pace for approximately 2 hour segments between arrival, first break, lunch, second break, and departure; attending work regularly without excessive early departures or absences during the typical 40 hour work week); to make simple judgments and work-related decisions; to respond appropriately to supervision, coworkers and work situations (e.g., asking simple questions or requesting assistance, accepting

> instructions, responding appropriately to criticism from supervisors, cooperating with others, appropriately handling disagreements with others, not distracting others or exhibiting behavioral extremes); and to deal with changes in a routine work setting.

(AR 141 (emphasis added).)  Upon reconsideration, state agency psychological consultant Alan L. Berkowitz, M.D., opined that Plaintiff had no limitations with respect to understanding, remembering, or applying information. (AR 157–58.)

In his decision, the ALJ addressed the state agency psychological consultants' findings as follows:

> The State agency psychological consultants initial prior administrative medical finding the claimant had moderate limitation to understand, remember, or apply information, moderate limitation to interact with others, moderate limitation to concentrate, persist, or maintain pace, and moderate limitation to adapt or manage oneself [AR 136].  Upon reconsideration, the claimant had no limitation to understand, remember, or apply information, mild limitation to interact with others, mild limitation to concentrate, persist, or maintain pace, and mild limitation to adapt or manage oneself [AR 157]. The undersigned gives some weight to the prior administrative medical finding, as it is consistent with the medical evidence of record and the claimant's consistent mental health treatment, as well as his current employment.

(AR 30.)  With respect to Plaintiff's mental RFC, the ALJ then determined that Plaintiff was limited to "understanding, remembering, and carrying out simple routine tasks." (AR 24.)  The ALJ also determined that Plaintiff was limited to only "simple work-related decisions," "occasional interaction with the general public," and "occasional work-related, non-personal, non-social interaction with coworkers and supervisors." (AR 24.)

///
///
///
///
///
///

Plaintiff argues that the ALJ erred by failing to explicitly consider and reject one of the examples[5] Dr. Garland provided in his notes—a limitation to "understanding, carrying out, & remembering 1 to 2 step instructions." (ECF No. 13 at 11–12.) Plaintiff argues this was a significant "qualification" provided by Dr. Garland rather than just an example. (*Id.* at 11.) Plaintiff further argues that the ALJ's error was material to the ALJ's Step Five determination and therefore not harmless. (*Id.* at 12–14.)[6]

ALJs must "consider and address medical source opinions" when assessing a claimant's RFC. SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996); *see also* 20 C.F.R. § 404.1520c. "If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." *Id.* "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Miner v. Berryhill*, 722 F. App'x 632, 633 (9th Cir. 2018) ("[W]here a minor conflict can be willfully read into various parts of the record, such conflict goes only so far as to make the evidence susceptible to more than one rational interpretation, which is not enough for the court to disturb the ALJ's decision." (internal quotation marks and citation omitted)).

Here, the Court finds that the ALJ rationally concluded that Dr. Garland only opined that Plaintiff was limited to understanding, carrying out, and remembering simple instructions. This limitation is consistent with Dr. Garland's finding that Plaintiff was only "moderately limited" in his ability to understand, remember, and carry out detailed instructions. *Cf. Thomas v. Saul*, 796 F. App'x 923, 926 (9th Cir. 2019) (finding a psychologist's report limiting the claimant to "simple, routine type work" with a moderate

---

[5]   "E.g." is a Latin abbreviation and means "for example." *See E.G.*, Black's Law Dictionary (11th ed. 2019).

[6]   An RFC limitation to simple or repetitive tasks is consistent with Reasoning Level 1 or 2; however, a limitation to one- or two- steps tasks is only consistent with Reasoning Level 1. *See Rounds*, 807 F.3d at 1003–04, n.6.

limitation on the ability to deal with detailed instructions, when "[r]ead as a whole," does not conflict with the conclusion that the claimant was capable of Reasoning Level 2).

Moreover, it appears that Dr. Garland was merely stating that Plaintiff could perform the basic mental demands of unskilled work, which are defined as follows:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.

SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985). The SSA Program Operations Manual System (POMS) similarly defines the basic mental demands of unskilled work as follows:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to:
> - understand, carry out, and remember simple instructions;
> - make judgments that are commensurate with the functions of unskilled work, i.e., simple work-related decisions.
> - respond appropriately to supervision, coworkers and work situations; and
> - deal with changes in a routine work setting.

Mental Limitations, SSA POMS DI 25020.010.

The only *limitation* Dr. Garland added to these demands, as opposed to providing an *example*,[7] was a limitation to "relatively low interpersonal contact." (AR 141.) The ALJ included this limitation in Plaintiff's RFC. (AR 24.) Therefore, Dr. Garland's statement could reasonably have been interpreted by the ALJ as follows: Plaintiff should be able to carry out the demands of unskilled work in a work context "where there is relatively low

---

[7] *Cf.* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00(E) (explaining the paragraph B criteria for mental disorders, such as understanding, remembering, or applying information, by way of examples and stating that "[t]hese examples illustrate the nature of this area of mental functioning," but noting that the SSA "do[es] not require documentation of all of the examples").

interpersonal contact." *See Rounds*, 807 F.3d at 1006 (ALJs are permitted a certain amount of leeway in "translating and incorporating clinical findings into a succinct RFC"). The RFC provided to the VE included a limitation to low interpersonal contact and all of the jobs identified by the VE were unskilled jobs.

Accordingly, the Court finds that the ALJ's decision not to incorporate each of Dr. Garland's examples as further limitations or qualifications on Plaintiff's mental ability to understand, remember, and carry out instructions was rational. Therefore, the Court finds that the ALJ did not err in assessing the opinion of Dr. Garland.

### C.   Constitutionality

Lastly, Plaintiff argues that the statutory clause for removal of the Commissioner of Social Security is unconstitutional, rendering Commissioner Andrew Saul's[8] appointment invalid, and therefore rendering the ALJ's nondisability decision, which was issued during Commissioner Saul's tenure, tainted. (ECF No. 13 at 15–18.) In opposition, the Commissioner concedes that the statutory removal clause in the Social Security Act "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (ECF No. 18 at 13.) However, the Commissioner argues that this conclusion alone does not support setting aside Plaintiff's unfavorable disability benefits determination; rather, Plaintiff must demonstrate that the unconstitutional removal clause affected the ALJ's determination of his claim, and he has failed to do so. (*Id.* at 14–20.) As set forth below, the Court agrees with the Commissioner.

In *Kaufmann v. Kijakazi*, 32 F.4th 843 (9th Cir. 2022), the Ninth Circuit held, as a matter of first impression, that the Social Security Act's removal provision, 42 U.S.C. § 902(a)(3), is unconstitutional, but also that it is severable from the remainder of the statute. *Id.* at 848. Therefore, the unconstitutional removal provision "does not affect the *authority*

---

[8]   Andrew Saul was the Acting Commissioner of Social Security during Plaintiff's hearing, the ALJ's decision, and the Appeals Council's final denial of review. (ECF No. 13 at 17.)

of the underlying agency officials to act." *Id.* at 849 (citing *Collins v. Yellen*, 141 S. Ct. 1761, 1787–88 & n.23 (2021)). To the extent the ALJ, the members of the Appeals Council, and the SSA Commissioner all served, at all relevant times, under valid appointments, "there is no reason to regard any of the actions taken by the [SSA] as void." *Id.* (quoting *Collins*, 141 S. Ct. at 1787).

"A party challenging an agency's past actions must instead show how the unconstitutional removal provision *actually harmed* the party—for example, if the President would have removed the agency's head but for the provision or, alternatively, if the agency's head 'might have altered his behavior in a way that would have benefited' the party." *Id.* (quoting *Collins*, 141 S. Ct. at 1789). Plaintiff therefore must "demonstrat[e] that the unconstitutional provision actually caused [him] harm." *Id.* (quoting *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021)). "Absent a showing of harm, [a court will] refuse to unwind the decision[] below." *Id.* (quoting *Decker Coal Co.*, 8 F.4th at 1137).

Here, Plaintiff initially argues that the appointment of Commissioner Saul was unconstitutional and therefore the case should be remanded for a new hearing and administrative decision. (ECF No. 13 at 15–18.) However, the cited authority does not support the argument that Commissioner Saul's *appointment* was unconstitutional. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2209 (2020) ("The only constitutional defect we have identified in the [Consumer Financial Protection Bureau's] structure is the Director's insulation from removal."); *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051 (2018) (holding that Securities and Exchange Commission ALJs are "Officers of the United States" for purposes of the Appointments Clause of the Constitution);[9] Office of

---

[9]   In response to the Supreme Court's holding in *Lucia*, Acting Commissioner Berryhill ratified the appointments of all SSA ALJs in July 2018. *See* SSR 19-1P, 2019 WL 1324866, at *2 (Mar. 15, 2019). Plaintiff concedes that ALJ Messer was properly appointed by Commissioner Berryhill. (ECF No. 19 at 5.)

Legal Counsel, Constitutionality of the Comm'r of Soc. Sec.'s Tenure Prot., 2021 WL 2981542, at *11 (O.L.C. July 8, 2021) (concluding that "the President may remove the SSA Commissioner at will" and that "disregarding the constitutionally unenforceable restriction on removal in 42 U.S.C. § 902(a)(3) would not affect the validity of the remainder of the statute").  To the contrary, in *Collins*, the Supreme Court found that a defective removal procedure did not render the confirmed Federal Housing Finance Agency ("FHFA") Director's *appointment* invalid, and thus did not render the FHFA's actions under the Director void from the outset.  141 S. Ct. at 1787 ("Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.  As a result, there is no reason to regard any of the actions taken by the FHFA [challenged on appeal] as void.").  The same is true here.  The infirm removal provision does not render Commissioner Saul's appointment invalid, which in turn does not render the SSA's nondisability decision void from the outset.[10]

The question is therefore whether Plaintiff has demonstrated that the unconstitutional removal provision actually caused him harm.  The Court finds that Plaintiff has not presented any evidence or a plausible theory to show that the removal provision specifically caused him any harm.  *See Kaufmann*, 32 F.4th at 849–50.  Plaintiff argues that the White House's statement that Commissioner Saul was terminated in part because he "undermined and politicized Social Security disability benefits" and "reduced due process protections for benefits appeals hearings," and the timing of the termination, is the type of harm contemplated by *Collins*.  (ECF No. 19 at 6.)  However, Plaintiff does not identify any direct connection between the unconstitutional removal clause and the

---

[10]    The Ninth Circuit in *Kaufmann* assumed for purposes of its analysis that Commissioner Saul served under a valid appointment. *See Kaufmann*, 32 F.4th at 849.  In his reply, Plaintiff appears to concede that Commissioner Saul was properly appointed. (ECF No. 19 at 5.)

ALJ's specific decision denying Plaintiff benefits and the Court cannot identify one in the record. *See Kaufmann*, 32 F.4th at 849–50 (suggesting the claimant could demonstrate the unconstitutional removal provision caused her harm by asserting "that the President took an interest in her claim or that the Commissioner directed the Appeals Council to decide her case in a particular way because of the statutory limits on the President's removal authority"); *see also Collins*, 141 S. Ct. at 1802 (Kagan, J. concurring in part) (opining that "I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone" because "[w]hen an agency decision would not capture a President's attention, his removal authority could not make a difference"). Absent a showing of harm, the Court will not unwind the SSA's decision.

Accordingly, although the Social Security Act's removal provision is unconstitutional, the Court does not find remand appropriate on this basis.

## VI. CONCLUSION AND RECOMMENDATION

For the reasons discussed above, the Court affirms the decision of the Commissioner and **DENIES** Plaintiff's request for reversal and/or remand.

**IT IS SO ORDERED.**

Dated:  September 6, 2022

*Jill Burkhardt*

Hon. Jill L. Burkhardt
United States Magistrate Judge